**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID NATHAN CYPHER,                )
                                    )
            Plaintiff,              )
                                    )
    vs                              )         Civil Action No. 23-1428
                                    )
J.V. MANUFACTURING CO., INC., et al.,  )      Magistrate Judge Dodge
                                    )
            Defendants.             )

**<u>MEMORANDUM OPINION</u>**

This action by Plaintiff David Nathan Cypher ("Cypher") arises out of the termination of his employment with J.V. Manufacturing Company, Inc. ("JVM"). Cypher alleges that when he attempted to return to work after completing leave under the Family and Medical Leave Act, he was terminated because of disability discrimination and retaliation. In addition to JVM, Plaintiff names as Defendants the company's president, Ryan Vecchi ("RV"), and its vice president, Melissa Vecchi ("MV") (sometimes collectively referred to as "the Vecchis").

Pending before the Court is Defendants' motion for summary judgment on Cypher's claims of retaliation in violation of the Americans With Disabilities Act and the Pennsylvania Human Relations Act and interference and retaliation in violation of the Family and Medical Leave Act (ECF No. 111). For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## I.    **<u>Relevant Procedural History</u>**

Cypher commenced this action in August 2023, naming JVM and MV as defendants. Federal question jurisdiction is based on the federal civil rights claims asserted in the Complaint, 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction is asserted over the state-law claims, 28 U.S.C. § 1367(a). Cypher subsequently filed an Amended Complaint (ECF No. 20), a Second

Amended Complaint which added RV as a Defendant (ECF No. 36), and a Third Amended Complaint ("TAC") (ECF No. 56).

The TAC alleges claims of disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 ("PHRA") (Count I); failure to accommodate in violation of the ADA and the PHRA (Count II); retaliation and wrongful termination in violation of the ADA and the PHRA (Count III); and interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54 ("FMLA") (Count IV).

The Vecchis filed a motion to dismiss the Second Amended Complaint and JVM moved dismiss the TAC. On August 14, 2024, the Court issued an opinion and orders regarding both motions to dismiss (ECF Nos. 73, 74, 75) that dismissed Counts I and II, dismissed Count III as to the Vecchis and denied the motion regarding Count IV, which is asserted against all Defendants.

On April 11, 2025, Defendants filed a motion for summary judgment (ECF No. 111), which has been fully briefed (ECF Nos. 112, 116, 125).

## II.    **Material Facts**[1]

Cypher began employment with JVM on September 30, 2019 as a "CNC Engineer." Cypher was hired by and for the most part reported to RV, the President of JVM. (Defendants' Concise Statement of Material Facts ("DCSMF") ¶ 3) (ECF No. 113); Plaintiff's Response to Defendants' Concise Statement of Material Facts and Statement of Additional Facts

---

[1] These facts are taken from Defendants' Concise Statement, Plaintiff's Response and Additional Facts and Defendants' Reply, but only to the extent they are relevant. Plaintiff responded to Defendants' 74 paragraphs of facts with an additional 187 paragraphs of facts to which Defendants replied at length. Many of the facts submitted by the parties relate to tangential issues that are not material or relevant to the resolution of Defendants' motion.

("PRDCSMF") ¶ 75) (ECF No. 118); Defendants' Response to Plaintiff's Statement of Additional

Facts ("DRPSAF") ¶ 75) (ECF No. 126.)[2] MV, RV's spouse, is Vice President of JVM. (DCSMF

¶ 35.)

Cypher was promoted in 2021 to the position of Component Manufacturing Machining

Supervisor, a position which he held until he was terminated. He was in charge of eleven

employees and oversaw various aspects of cost production and workflow, tooling and process

improvements. (DCSMF ¶¶ 1-2; PRDCSMF ¶¶ 75, 78; DRPSAF ¶ 75) Cypher was permitted to

work from home and did so on one or two occasions prior to his FMLA leave. (DCSMF ¶ 4;

PRDCSMF ¶ 90.)

A.  Cypher applies for and goes on FMLA as a result of a medical issue

In 2022, Cypher sustained a torn meniscus and a slightly torn ACL or MCL. (DCSMF ¶¶ 5-

6.) On July 11, 2022, Cypher had a preoperative visit with his surgeon, Dr. Scott Szabo, and was

scheduled to undergo knee surgery to repair his torn meniscus on July 20, 2022. (PRDCSMF ¶ 84.)

He notified JVM on July 12, 2022, that he was scheduled for surgery and would need to take

FMLA leave. On July 13, 2022, Kristina Poole ("Poole"), JVM's Human Resources Manager, sent

him the necessary forms, including a copy of his job description, to be completed and sent to his

surgeon. (DCSMF ¶¶ 7-8; PRDCSMF ¶¶ 85-86.)

The job description that was provided to Cypher by JVM lists essential job functions and

identifies the following physical demands: "Physical ability and mobility to walk, stand, and sit

for prolonged periods of time, to occasionally stoop, bend, kneel, crouch, crawl, climb, reach,

---

[2] Cypher asserts that on or around September 8, 2022, he was told that he would report to Chad
Jones. (PRDCSMF ¶¶ 3, 79.) But as this took place while Cypher was on FMLA leave and he was
then terminated (DRPSAF ¶ 79), Jones never actually acted as Cypher's supervisor.

twist, and make repetitive hand movement; ability to climb unusual heights on ladders, to lift, carry, push, and/or pull moderate to heavy loads; to operate assigned equipment and vehicles." (Pl.'s App. Ex. Q at JVM000112) (ECF No. 117.) It is undisputed that Cypher provided this job description to Dr. Szabo. Cypher's request for FMLA leave was approved by JVM on July 20, 2022, and he received twelve weeks of leave. He understood that his leave concluded on October 11, 2022. (DCSMF ¶¶ 11-12.)

JVM's FMLA policy, which Cypher reviewed before filling out his request, requires an employee to provide an update after every doctor's appointment or, if no appointment occurs, every thirty days. The FMLA paperwork completed by Cypher also stated that he was required to provide JVM with periodic updates. (DCSMF ¶¶ 62-65.)

On July 20, 2022, Cypher underwent surgery for a torn meniscus, which required a period of recovery and rehabilitation of up to six months. (DCSMF ¶ 9; PRDCSMF ¶ 88.)[3] The post-surgery restrictions imposed by Dr. Szabo included no driving, no heavy lifting, carrying, pushing or pulling, no prolonged standing or walking, and no crouching, kneeling or pivoting. (DCSMF ¶ 10.)

Cypher asserts that Dr. Szabo's extensive restrictions were the result of the job description he was given by JVM and the Vecchis admitted that this description overstated the demands of his job and resulted in delays in his return to work. (PRDCSMF ¶¶ 8-10, 80-82, 170, 185-86.) Defendants represent that these physical demand requirements are standard language that appears in every job description that the company would work to accommodate. They also correctly note that Cypher has cited no evidence that Dr. Szabo relied on this document. Nor did the Vecchis

---

[3] According to Cypher, Dr. Szabo's post-operative notes from July through September 2022 reflect continued pain, swelling, use of crutches and restricted range of motion. (PRDCSMF ¶ 89.)

testify that the job description was inaccurate. Rather, RV said it was accurate and MV testified that "the job description, the summary and essential functions are Nate Cypher's role." (DRPSAF ¶¶ 80-82, 170, 185-86.) Neither Cypher nor Defendants deposed Dr. Szabo. At the same time, it is a fair inference to be drawn in Cypher's favor as the non-moving party that Dr. Szabo referred to the job description when determining when Cypher would be released to return to work since the limitations imposed by Dr. Szabo are consistent with the job description.[4]

On July 25, 2022, Cypher, who was at home following his surgery, began approving the timecards of employees he supervised. MV told Poole to tell him that he did not need to do any work while on FMLA. The next day, Poole emailed Cypher telling him that his job duties would be handled while he was "out healing." (PRDCSMF ¶¶ 4, 91-92, 94.)[5]

B. Cypher's return is delayed

On August 8, 2022, Cypher advised Poole in an email that his recovery was going well and he expected to be back before the expiration of his FMLA. Poole asked him to notify her after his next doctor's appointment on September 2 regarding his anticipated date of return to work. (DCSMF ¶¶ 13-14.)

After his appointment on September 2, Cypher emailed Poole on September 6 to advise that his recovery was not going as planned and he would require an additional six weeks of physical therapy. He told Poole that his next appointment with Dr. Szabo was scheduled for October 18 and he would not be able to return to work before then. (DCSMF ¶¶ 15-16; PRDCSMF ¶¶ 135-36.) Poole did not respond to his email or otherwise request any medical documentation at that time.

---

[4] As discussed below, JVM would later tell Dr. Szabo's office that Cypher was "a supervisor and does not do any heavy lifting." (PRDCSMF ¶ 195.)
[5] Defendants contend that asking Cypher to work while he was on FMLA leave could have violated the statute. (DRPSAF ¶¶ 93, 97.) This issue is discussed below.

(PRDCSMF ¶ 15.)

According to Defendants, Cypher did not attempt to schedule a doctor's appointment that would take place before the expiration of his FMLA on October 11 or before his vacation in North Carolina between October 8 and October 16. (DCSMF ¶¶ 19-20, 22.) Cypher claims that while he attempted to schedule an appointment after his previously scheduled vacation, the only other available appointment was on October 14, which was also after the expiration of his FMLA. (PRDCSMF ¶¶ 20, 22.)

C.  Cypher applies for long term disability benefits

Poole emailed Cypher on October 5, 2022 to remind him that his FMLA leave would expire on October 11, 2022 and if then used, his available paid time off ("PTO") would expire on October 19, 2022. (DCSMF ¶ 23.) Poole provided Cypher with the necessary documentation to apply for long-term disability ("LTD") benefits and asked him to complete the forms and return them to Principal Life Insurance Company ("Principal"), JVM's LTD administrator. (*Id.* ¶ 24.) The application included three forms: one to be completed by Cypher, one by Dr. Szabo and one by JVM. (*Id.* ¶ 26.) In language approved by the Vecchis, Poole's email also stated that the LTD benefits were designed to "bridge the time" between the expiration of his FMLA leave and his return to work and that he was required to obtain a fitness-for-duty certification from his doctor prior to returning to work. (PRDCSMF ¶¶ 23-24, 150-52, 217-18.)

The same day, Cypher completed the employee form and began to fill in the employer form. In the box on the employer form that asked, "Does the employee work from home," Cypher checked "no." (DCSMF ¶ 25; PRDCSMF ¶¶ 25, 98-99.) Cypher asked Poole to finish the remainder of the employer form. When she completed the form, Poole left blank the next box, which asked "is this an option?" She also left blank the last two employer questions, "Can you

accommodate part time work?" and "Light duty work?" (PRDCSMF ¶¶ 25, 153.)

Cypher claims that this reflects that JVM "certified" that he did not work from home and "that work from home was not available for his position." (PRDCSMF ¶ 95.) He further contends that JVM never offered him the option of working from home or light duty either during his FMLA leave or thereafter. Further, according to Cypher, because he returned the form with these blanks, he was essentially requesting accommodations from JVM that it denied. (*Id.* ¶¶ 96, 100-02.)

Cypher never provided any updates on his restrictions other than what was listed on his original FMLA paperwork and never told Poole that he was capable of working from home or performing light duty. (DCSMF ¶¶ 17-18; DRPSAF ¶ 96.) As Defendants assert, the purpose of this form was to determine whether Cypher qualified for LTD benefits and had nothing to do with his FMLA leave. (DRPSAF ¶100.) Defendants also dispute Cypher's characterization of his submission of the form as posing questions to JVM, noting that his email to Poole never raised these questions and he did not testify that this was his intent. (DRPSAF ¶¶ 100-02.)

According to the LTD form, long term disability exists when an employee is "unable to perform a majority of the substantial and material duties of his or her own occupation." Poole interpreted Cypher's application as a representation that he was unable to work at that time. (DCSMF ¶¶ 31-33.) Cypher notes, however, that Poole sent him the LTD forms with the statement that LTD would "bridge the time" between the expiration of his FMLA leave and his return to work. (PRDCSMF ¶¶ 31-33.) As Poole testified, "he was out of FMLA on 10/11. His doctor's appointment wasn't until 10/18. I mean, yeah, I was doing by duty to protect him and continue his wages with offering him a benefit that – that J.V. offers." (PRDCSMF ¶ 111.)

D. <u>Relevant events leading to termination</u>

According to Defendants, beginning in early October 2022, the Vecchis began to hear complaints from other employees at JVM, particularly John Tritschler, that they had seen pictures of Cypher performing physically demanding activities while on leave. As a result, RV began to have concerns about whether Cypher was being honest with him about his condition. (DCSMF ¶¶ 34, 36-37.)[6]

On October 18, the scheduled date of his next appointment with Dr. Szabo, Cypher advised the doctor's office that he had cold or COVID-like symptoms. As a result, Dr. Szabo's office canceled his appointment and rescheduled it for October 27. Unbeknownst to Defendants, Cypher went hunting, during which he killed a deer, loaded it into his vehicle and drove home. (DCSMF ¶¶ 40-41; PRDCSMF ¶ 40-41.)[7]

---

[6] Cypher disputes these statements on the grounds that Defendants have not produced any supporting documentation or evidence about who made these reports. Thus, Cypher claims, RV's statement about what Tritschler said is hearsay and there is a genuine issue of fact as to whether RV's concerns were honestly held. (PRDCSMF ¶¶ 34, 36-37, 184.) Defendants assert that employee reports about Cypher are not being submitted for the truth of the matter asserted, but to show RV's state of mind. Fed. R. Evid. 801(c). During this deposition, Cypher admitted to performing various physical activities while on leave, many of which he texted about with co-workers. (DRPSAF ¶ 184.) In any event, it is undisputed that Defendants did not terminate Cypher's employment in early October based on these activities; rather, they terminated his employment on October 25 based on a matter that is described below.

[7] Cypher also states that he communicated about his limited activities with his manager (Jones) and told Jones that he asked the doctor to release him over the phone but was told he had to come in for an evaluation. (PRDCSMF ¶¶ 40-41.) As noted above, however, Jones never actively became Cypher's manager. The record Cypher cites (Pl.'s App. Ex. N at CYPHER00159) is a series of texts with Jones in which they compared notes about their respective surgeries. See Cypher Dep. 112:16-17 (his texts were "about hunting, fishing, he had knee surgery himself.") There is no evidence that Cypher believed he was making a report about his condition to a supervisor or that any of this information was conveyed to Poole or the Vecchis.

Cypher did not tell Poole on the 18th that the appointment had been rescheduled because it "slipped his mind." (DCSMF ¶¶ 38-39; PRDCSMF ¶¶ 38-39.)[8] The next day, Poole called Cypher to inquire about his appointment. Cypher told her that the appointment did not take place and was rescheduled for October 27. Poole told him to make sure to bring his "return to work [certification] to come back in the building." Poole also reminded Cypher that this was his last day of PTO. (DCSMF ¶¶ 42-44, 46; PRDCSMF ¶¶ 165-67.)

Cypher then called Dr. Szabo's office and requested a release to go back to work. He was informed, however, that he would need to be re-evaluated in person at his appointment the following week. As noted in the medical records, "Dr. Szabo did not want him doing any heavy lifting for a period of 3 months post-op, which ends right about now. Would recommend re-evaluation at his follow up to ensure that he is good to return to work." (PRDCSMF ¶¶ 168-69, 171.) Later that day, Poole contacted the doctor's office to request confirmation that Cypher's October 18 appointment had been canceled and rescheduled for October 27. Dr. Szabo's office sent Cypher a request for release of information for him to provide to JVM, but he did not submit it to JVM because he said that his printer was not working. While it was suggested to Poole that Cypher could provide verbal consent in a conference call, no call took place. (PRDCSMF ¶¶ 172-78, 208; DRPSAF ¶¶ 172-78.)[9]

In an email and a subsequent call, Cypher asked Poole to let him know if she needed anything else, and Poole stated that she did not. (PRDCSMF ¶¶ 129, 179, 181, 192.)

---

[8] While Cypher denies that this is a direct quote (PRDCSMF ¶ 38), he used this precise language when asked about it during his deposition (Cypher Dep. 97:19) (ECF No. 119 Ex. A).

[9] JVM did not subsequently contact the doctor's office until October 24. (PRDCSMF ¶ 178.)

On October 22, 2022, Cypher went to Port Farms with his family. During this outing, pictures and a video were taken that showed him going down a large slide while sitting on a burlap sack at a corn maze. Both RV and MV viewed the video and discussed whether Cypher should be terminated. RV strongly believed that Cypher should be terminated because JVM had been misled and Cypher was falsifying information and "cheating the system" and JVM. (DCSMF ¶¶ 47-53.)[10]

Cypher denies making any misrepresentations about his condition and contends that the activities in which he was engaged on October 22 did not require weight-bearing or strain on his knee and were not inconsistent with the medical restrictions previously communicated to JVM. (PRDCSMF ¶¶ 48, 183.)[11] Further, he claims that JVM was aware that he was actively trying to return to work. (Id. ¶¶ 50-53, 219.)

MV called Dr. Szabo's office on October 24 to learn more about Cypher's current circumstances. (DCSMF ¶ 54.) She was asked to initiate a three-way call with Cypher so that he could authorize her over the phone to review his medical records, but she claimed that she did not know how to do this on her cell phone. Nevertheless, she was informed that Cypher was not yet cleared to return to work and that he had a visit with his doctor scheduled for October 27. (PRDCSMF ¶ 54.) Cypher's medical records note that JVM was "requesting a work note stating the patient's current activity restriction, length of restrictions, and work status. They would like this note today. They stated he is a supervisor and does not do any heavy lifting." (PRDCSMF ¶ 195.)

---

[10] The continuation of his salary while on FMLA was paid through JVM's short-term disability policy. (DCSMF ¶ 73.)

[11] Cypher's citations to the record do not support this position. In turn, Defendants have cited no support for RV's conclusion that Cypher's actions were inconsistent with his medical restrictions. It is undisputed that no one from JVM ever discussed this matter with Cypher or his doctor.

When Cypher then asked his doctor's office for documentation to provide to JVM, Dr. Szabo's nurse told him to submit Dr. Szabo's September 2 note. (*Id.* ¶ 199.) Later that day, Cypher sent an email to a JVM Human Resources mailbox (not to Poole directly) attaching this note. He had not previously provided the note to JVM. No one at JVM saw this email until October 25. (DCSMF ¶¶ 55-56; PRDCSMF ¶ 200.)[12]

Poole emailed RV and MV to summarize a call she just had with Cypher. During that call, Cypher asked Poole if JVM had contacted his doctor. She responded that they had in order to obtain documentation as they had not received anything since July 12, 2022. (PRDCSMF ¶¶ 202-03.) According to Cypher, he explained that he was trying to pick up paperwork from his doctor's office that day but might not be able to make it because of a family obligation and would obtain documentation the following day if necessary. Poole told him she "understood that he had obligations." (*Id.* ¶ 204.)

E. <u>Relevant JVM policies</u>

    1. FMLA policy

The terms of the FMLA policy require an employee to provide "an update to Human Resources regarding his status after any applicable doctor's visit or, at minimum, every thirty (30) days." Defendants contend that Cypher was required to provide every doctor's note he received and did not timely provide the September 2 note. (DCSMF ¶ 66.) According to Cypher, the policy did not explicitly require him to provide every doctor's note. Poole initially testified that this was

---

[12] Citing the mailbox rule, Cypher claims that this document is presumed received once it is properly addressed and placed in a recipient's mailbox. (PRDCSMF ¶ 56.) This legal doctrine has no bearing on the issue of when JVM became aware of the message sent by Cypher on October 24. And while Cypher claims that this inbox is monitored frequently by MV, Poole and another JVM employee (*id.* ¶ 201), there is no evidence that contradicts Defendants' representation that no one saw the note until the next day.

a requirement but then revised her response to say that Cypher was supposed to "provide follow-up." (PRDCSMF ¶¶ 66, 130; ECF No. 113 Ex. 5.)

Cypher provided certain information to JVM on August 8 and September 6 regarding appointment dates and status reports. No one from JVM contacted him to say that these updates were insufficient. (PRDCSMF ¶¶ 132-33, 137, 215.)[13] Defendants never requested that he provide doctor's notes until October 24. Rather, they required that he submit a return-to-work certification. (PRDCSMF ¶¶ 120, 161, 211-12, 234.)

The September 2 doctor's note does not list any specific restrictions other than "must use crutches, wean when ready." Defendants contend that although it reflects that his restrictions had changed, Cypher did not timely inform JVM of these changes. (DCSMF ¶¶ 57-58.) Cypher asserts otherwise, noting that JVM was aware that he was still under medical supervision, was still undergoing PT, had a doctor's appointment scheduled for October 27 and would not be released to work before that visit. (PRDCSMF ¶¶ 57-58.).

  2.  Employee Handbook

JVM's Employee Handbook at policy No. 8.8 (Reinstatement) provides, in relevant part: "As a condition of returning to work from leave for employee's own serious health condition, the employee must timely present a certification from his/her health care provide that the employee is able to resume work. Restoration may be denied until the certificate is presented." (DCSMF ¶¶ 69-70.) Cypher never provided a note from his doctor saying that he could return to work. (DCSMF ¶ 71.) According to Cypher, however, JVM was aware that his next evaluation was scheduled for

---

[13] Defendants note that Cypher did not provide any update within thirty days of September 6. (DRPSAF ¶ 132.) However, on October 5, Poole sent Cypher the LTD application described above. JVM did not complain that Cypher failed to provide an update at that time or terminate his employment for this reason.

October 27, and he was terminated two days before that appointment. He ultimately obtained this certification on October 27, albeit after his termination. (PRDCSMF ¶ 71.)[14]

Under JVM's policy, an employee is allowed five "unexcused absences" before facing termination. Cypher contends that his first unexcused absence would have been on October 24 but he was terminated without warning or progressive discipline on Tuesday, October 25. (PRDCSMF ¶¶ 122-24, 251-52.) Defendants counter that JVM's attendance and call-off procedures are separate from its FMLA policy, and at any rate, Cypher was terminated not because he may have exceeded the number of unexcused absences but because RV believed he was "cheating the system." (DRPSAF ¶¶ 122-24, 251-52.)

F. Cypher's employment is terminated

On October 25, 2022, JVM sent a termination letter to Cypher by courier. (DCSMF ¶ 59.)[15] The letter, signed by Poole, stated that:

> As you know, you were granted FMLA leave on July 20, 2022, for [arthroscopic] surgery regarding your meniscus as certified by your physician. The FMLA certification provided that you would need to be off of work for 4-6 weeks **or** 4-6 month[s] depending on the scope of your surgery. Thereafter, despite multiple requests, you refused to provide documentation from your physician regarding the duration of your incapacity and time need to be off from work. Beginning October 19, 2022, your available FMLA, PTO and Short-term disability were exhausted. You told us that you continued to be incapacitated and unable to perform your job. As a result of your representations, the procedures and corrective actions specified in the Attendance Policy were not utilized.

> The Company has obtained evidence that you have been engaged in activities that are contrary to your representations regarding your incapacity. As you know, honesty is a core value at JV Manufacturing. Based upon the information we have obtained; the Company has made the decision to discharge you from your

---

[14] JVM did not terminate Cypher based on his failure to submit a return-to-work certification. As discussed below, however, Cypher contends that his return to work was delayed by JVM's insistence that he submit this certification.

[15] Cypher notes that the letter was drafted no later than the morning of October 24, 2022. (PRDCSMF ¶ 187.)

employment at JV Manufacturing Company Inc. If you have any mitigating information that you would like the Company to consider, please contact me immediately.

(Pl.'s App. Ex. AN; DCSMF ¶¶ 60-61.) Cypher claims that the reference to "multiple requests" is false. JVM requested a return-to-work certification late in the process and never previously requested medical records. (PRDCSMF ¶ 207.) He also represents that he never told JVM that he remained incapacitated, but rather, consistently relayed accurate information from his doctor that he was not yet cleared to return to work and required an additional in-person evaluation. (*Id.* ¶ 214.)

Cypher asserts that he was terminated without warning or progressive discipline. (PRDCSMF ¶¶ 223, 247-48.) According to Defendants, however, JVM's policies allow it to combine or skip disciplinary steps depending on the facts of each case and progressive discipline was not appropriate in this case. (DRPSAF ¶¶ 223, 247-48.)

On October 27, 2022, after his termination, Cypher attended his medical appointment. His medical records reflect that while he represented that he was still experiencing pain, swelling, and limited function in his right knee, he was cleared to return to work due to "social and financial reasons." (PRDCSMF ¶ 259.)

## III.    Standard of Review

The Federal Rules of Civil Procedure provide that summary judgment shall be granted in the absence of any genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

IV.    **Discussion**

A.    ADA and PHRA Claims

In Count III, Cypher alleges that JVM retaliated against him for engaging in protected activity under the ADA and the PHRA. Defendants move for summary judgment as to both claims.[16]

---

[16] Count III is also titled "wrongful termination." Defendants contend that to the extent Cypher is still attempting to assert this claim, it must be dismissed for the same reasons that Count I and II were previously dismissed; namely, that Cypher did not allege that he was disabled or that he was terminated because of a disability. (ECF No. 112 at 13.) Defendants are correct, and notably, Cypher failed to respond to this argument. Thus, to the extent that Cypher continues to assert a claim for wrongful termination in Count III, Defendants' motion for summary judgment will be granted.

Discrimination against an individual who has opposed a practice prohibited by the ADA is actionable conduct. 42 U.S.C. § 12203(a). The PHRA similarly prohibits retaliation. 43 P.S. § 955(d). As the Court of Appeals has held: "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) (citation omitted).

The procedures and remedies of Title VII of the Civil Rights Act of 1964 apply to ADA retaliation claims. 42 U.S.C. §§ 12117(a), 12203(c). In responding to a motion for summary judgment, a plaintiff alleging employment discrimination must first make out a prima facie case under the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). In a retaliation case, under the first step of that framework, a plaintiff "must establish a prima facie case by showing '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (citations omitted). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action.

If the defendant articulates such a reason, the burden then shifts back to the plaintiff to proffer evidence from which the trier of fact could conclude that this proffered reason is a pretext for unlawful discrimination. In that event, a plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). The employer's proffered reason cannot be a "post hoc fabrication." *Id.*

The same analysis is used for PHRA claims. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 150 n.1 (3d Cir. 2017); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

Defendants argue that Cypher cannot state a prima facie case of retaliation because he requested FMLA leave in July, it was granted until October 11, 2022 and he was not terminated until October 25, 2022. Thus, they contend that he cannot establish a causal link between his protected activity and his termination. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (three months between protected act and retaliation is not enough alone to create inference of causal nexus).

It is not necessary to reach the issue of causation, however, because Cypher has failed to proffer any evidence of a protected activity under the ADA. Notably, courts have held that "FMLA leave is not a reasonable accommodation under the ADA." *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 340 (E.D. Pa. 2015) (citation omitted), *aff'd*, 847 F.3d 144 (3d Cir. 2017). This is because:

> By requesting FMLA leave, the employee is telling his employer that he has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. On the other hand, an employee that requests a reasonable accommodation under the ADA is signaling that he "can perform the essential functions of the employment position." 42 U.S.C. § 12111. Thus, an employee who requests leave does not clearly communicate to her employer that she is disabled and desires an accommodation.

*Id.* at 340-41 (citation omitted). Thus, Cypher's original request for FMLA leave in July 2022 was not a request for a reasonable accommodation under the ADA or PHRA.

By contrast, "once a plaintiff exhausts FMLA leave, a request for an extended leave of absence is a request for a 'reasonable accommodation' pursuant to the ADA." *McCall v. City of Philadelphia*, 2013 WL 5823873, at *22 (E.D. Pa. Oct. 29, 2013) *aff'd*, 629 F. App'x 419 (3d Cir.

2015). But the request must be for a "reasonable accommodation only to the physical or mental limitations resulting from the disability of an individual with a disability that is known to the employer." *Id.*

Cypher's notice on September 6 that he would need six more weeks of PT and that his next doctor's appointment was scheduled for October 18 could reasonably be understood as a request for an accommodation in the form of additional time off because of a disability. This request was granted by JVM and thus cannot represent the failure to provide a reasonable accommodation.

Cypher did not return to work on October 18. Rather, on October 19, JVM contacted Cypher and he conveyed that his appointment had been rescheduled for October 27. At this point, his communication could be construed as a request for additional time off, but only for the purpose of obtaining a certification from his doctor. Indeed, he tried to obtain one over the phone on October 19 but was told he had to have an examination in person.

Notably, Cypher does not contend that he had a "disability" as of October 19 that rendered him unable to perform the functions of his job. As such, his request to JVM for further leave is not protected activity under the ADA or PHRA. Rather, he sought and was initially granted additional time to obtain a return-to-work certification under the FMLA due to the cancellation of his doctor's appointment on October 18. This conduct does not represent protected activity for purposes of an ADA or PHRA retaliation claim. Because he cannot maintain a prima facie case of retaliation discrimination, no further discussion of Defendants' proffered reason for his termination or Cypher's evidence of pretext is necessary.

Therefore, with respect to Count III, Defendants' motion for summary judgment will be granted in favor of JVM.

B.  FMLA Claims

In Count IV, Cypher alleges both interference and retaliation claims under the FMLA against all Defendants. Defendants move for summary judgment with respect to both claims.

Among other things, the FMLA grants to an eligible employee "the right to twelve workweeks of leave, over any period of twelve months, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under the Act:

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave:
>
> > (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> >
> > (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1).

The Act contains two distinct types of provisions: a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct, 29 U.S.C. §§ 2612, 2614(a)(1); and protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c). *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005). An employee may bring suit to enforce these rights under section 2617(a) of the Act. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004). Here, Cypher asserts claims based on both rights.

1.  Interference Claim

To make out a claim of interference under the FMLA, a plaintiff must establish:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an

employer subject to the FMLA's requirements; (3) the plaintiff was entitled to
FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to
take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was
entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014) (citation omitted). "One of the rights that it

guarantees is 'to be restored by the employer to the position of employment held by the employee

[or an equivalent position] when the leave commenced' upon return from FMLA leave." *Budhun*

*v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 252 (3d Cir. 2014) (quoting 29 U.S.C.

§ 2614(a)(1)).[17] In an interference claim, "the employee need not show that he was treated

differently than others. Further, the employer cannot justify its actions by establishing a legitimate

business purpose for its decision. An interference action is not about discrimination, it is only about

whether the employer provided the employee with the entitlements guaranteed by the FMLA."

*Callison*, 430 F.3d at 119-20.

Defendants contend that Cypher cannot maintain an FMLA interference claim because he

was given the requisite amount of FMLA leave through October 11, 2022, after which he lost all

of his FMLA rights, including the right to reinstatement. *See Dogmanits v. Capital Blue Cross*,

413 F. Supp. 2d 452, 462 (E.D. Pa. 2005) ("employees who exhaust the twelve weeks of leave

provided under the FMLA stand to lose their entitlement to job restoration even if their employers

provide additional, non-FMLA, leave.") (citation omitted). *See also Conoshenti,* 364 F.3d at 148

---

[17] The parties dispute whether an employer can invoke the "honest belief defense" (which can
apply in an FMLA retaliation case) in response to an interference claim. *Compare Parker v.
Verizon Pa., Inc.*, 309 F. App'x 551, 562 (3d Cir. 2009) (allowing it based on a regulation) *and
Warwas v. City of Plainfield*, 489 F. App'x 585, 588 (3d Cir. 2012) (same) *with Klemka v. Health
Network Labs. L.P.*, 2023 WL 3611535, at *6-8 (E.D. Pa. May 23, 2023) (finding these cases
unpersuasive and contradicted by the statutory text, which speaks of an employer's good faith and
reasonable grounds only in terms of reducing liability for liquidated damages). The Court need not
resolve this issue, however, because, as explained below, Cypher received all the FMLA leave he
requested.

("there is no question that Conoshenti exceeded his twelve weeks of protected leave and, under the [last chance agreement], he was subject to immediate discharge on the very first workday that he was both absent from work and no longer protected by the FMLA.")

Cypher argues that JVM interfered with his right to reinstatement in three respects: (1) by submitting an inaccurate job description that delayed his return by listing physical duties that were not required of him; (2) ignoring his request to complete a form indicating that he could work from home; and (3) creating an impossible barrier by requiring a return-to-work certification after his FMLA expired, first allowing him an extension to obtain the certification and then terminating his employment two days before he could obtain it.

Defendants reply that these arguments are not supported because they did not submit an inaccurate job description, and it did not prevent him from returning before October 11; the LTD application has no connection to his FMLA leave; and the return-to-work certification was a uniformly applied policy allowed under the FMLA. In any event, Cypher was terminated because RV saw the video of Cypher engaging in certain physical activities and honestly believed that Cypher was misusing his leave.

The Court need not address these disputes because Cypher has failed to respond to the pivotal issue with respect to this claim. Simply put, Cypher has cited no authority for his suggestion that an employee who has completed his twelve weeks of FMLA leave and then takes additional leave can successfully pursue a claim of interference when he is not reinstated.

"Generally, courts within this Circuit and others have been reluctant to extend the ability of a Plaintiff to bring FMLA interference claims or extending the FMLA's right to reinstatement beyond twelve weeks, when the employee takes leave beyond the twelve-week FMLA entitlement period and is subsequently terminated." *Knapp v. Thompson Grp., Inc.*, 2023 WL 8810785, at *14

21

(E.D. Pa. Dec. 19, 2023) (citation omitted). In *Knapp*, the plaintiff contended that the defendants interfered with his ability to return to work in multiple ways, including by requiring that he submit his medical clearance paperwork immediately at the conclusion of his leave, by failing to proactively contact his medical provider after they did not receive a copy of his clearance by the deadline and by requiring that he receive a second fitness-for-duty examination before returning to work. Rejecting these arguments, the court held that he "had exhausted his benefits at the time of his termination, and therefore cannot establish an FMLA interference claim." As a result, the court granted defendant's motion for summary judgment on plaintiff's FMLA interference claim. *Id.* at *15. *See also Banner v. Fletcher*, 834 F. App'x 766, 769-70 (3d Cir. 2020) ("Because the record shows that [plaintiff] had exhausted her leave . . . [defendant] is entitled to summary judgment on [the interference] claim."); *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 529 (D.N.J. 2008) (granting summary judgment for defendants on FMLA interference claim where plaintiff was granted and utilized her twelve-week FMLA entitlement)

Cypher was granted twelve weeks of FMLA leave, which expired on October 11, 2022. He did not return by that date. At that point, he lost all of his FMLA rights, including the right to reinstatement. Thus, his ultimate termination is not actionable under the FMLA and he has no basis on which to maintain a claim for FMLA interference. Therefore, Defendants' motion for summary judgment will be granted with respect to Cypher's FMLA interference claim.

2.  Retaliation

An FMLA retaliation claim is assessed under the burden-shifting framework established for a Title VII claim in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Capps*, 847 F.3d at 151. Under this framework, "a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate,

22

nondiscriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination." *Id.* at 152 (citation omitted).[18]

To state a prima facie case of FMLA retaliation, a plaintiff "must show that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights." *Capps*, 847 F.3d at 152 n.6.

The parties agree that Cypher requested and took FMLA leave and then sustained an adverse employment action when he was terminated. Defendants argue that a three-month time frame is too lengthy to support temporal proximity for purposes of causation. But they cite no authority holding that temporal proximity is measured from the date the employee first takes FMLA leave. On the contrary, "district courts within our circuit have instead chosen to measure temporal proximity in FMLA retaliation cases from the date the employee exhausted his FMLA leave." *Knapp*, 2023 WL 8810785, at *11 (citations omitted). Thus, the appropriate measurement is between the date Cypher's FMLA leave expired—October 11—and the date he was terminated—October 25—or fourteen days. This is sufficient for temporal proximity.

In addition, the request for FMLA leave in July was not his only protected activity. Rather, he requested additional leave in September and October 2022, the latter in part because JVM required that he submit a return-to-work certification that he could not obtain until he was seen by his doctor on October 27. Thus, Cypher has stated a prima facie case of retaliation.

---

[18] A Department of Labor regulation provides that employers "cannot use the taking of FMLA leave as a negative factor in employment actions," 29 C.F.R. § 825.220(c). As the Court of Appeals has noted, this suggests that courts should apply a lesser hurdle than that "but-for" causation standard applied in Title VII retaliation cases. *See Egan v. Delaware River Port Auth.*, 851 F.3d 263, 270-73 (3d Cir. 2017).

The burden of production shifts to Defendants to articulate a legitimate, non-discriminatory reason for Cypher's termination. It is undisputed that on October 22, RV and MV observed depictions of him engaging in physical activity which appeared to contradict his representations about his medical condition. As a result, they believed that his requests for additional leave were not medically necessary and represented a misuse of his FMLA leave because he was healthy enough to return. They also contend that Cypher did not submit Dr. Szabo's September 2 note about his medical status until October 24, after the decision had been made to terminate his employment. These reasons are sufficient to satisfy their light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).

The burden then shifts back to Cypher to proffer evidence from which the trier of fact could conclude that these proffered reasons for terminating his employment are a pretext for unlawful retaliation discrimination under the FMLA. Cypher proceeds along "*Fuentes* prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve Defendants' articulated legitimate reasons. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). He also proceeds along "*Fuentes* prong two, " contending that he has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. The test is "disjunctive" and either prong is sufficient; all of the evidence must be considered as a whole. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009).

As the Supreme Court has held, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 151.

24

As discussed above, virtually every issue raised here involves disputed facts. The job description required Cypher to perform demanding physical duties that may not actually have been part of his position and the record suggests that Dr. Szabo may have concluded that Cypher had to be able to perform all of these duties before he could be cleared for return to work. Defendants argue that: "Even when JVM told his doctor, in an effort to save his job, that Plaintiff did not do any heavy lifting, the doctor still insisted seeing Plaintiff before he could be cleared." (ECF No. 125 at 9.) But this information was not conveyed to Dr. Szabo's office until October 24, when the process of Cypher's termination was underway and nearly completed. Thus, Defendants' suggestion that they were attempting to "save" Cypher's job implies that they were somehow required to terminate Cypher's employment. However, they were not obligated to terminate his employment at all, much less to do so two days before his scheduled appointment at which he likely would be cleared for return to work.

The Court of Appeals has held that an employer may require an employee to submit a return-to-work certification. Further, "an employer may require that this certification address the employee's ability to perform the essential functions of her job, but only if the employer provides a list of essential functions to the employee at the time that the employer notices the employee that she is eligible for FMLA leave." *Budhun*, 765 F.3d at 253 (citing 29 C.F.R. § 825.312(b)).

JVM provided a list of essential functions to Cypher, which he provided to Dr. Szabo. Defendants contend that Cypher has failed to demonstrate that Dr. Szabo relied on it. This argument does not comport with the relevant provisions of the FMLA, however, which presumes that the employee's physician consults essential functions when determining the timing of an employee's ability to return to work. And as noted, Defendants informed Dr. Szabo's office on October 24 that Cypher's position did not require heavy lifting despite the contrary job

description.[19]

The issue of remote work is also disputed. Cypher contends that JVM informed him on July 25 that remote work was not permitted, while JVM asserts that it relieved him from all work duties during his FMLA leave because it understood that asking him to work while on leave could violate the statute. In support of its position, Defendants cite *Evans v. Books-A-Million*, 762 F.3d 1288, 1297 (11th Cir. 2014), which holds that "if an employer coerces an employee to work during her intended FMLA leave period and, subsequently, reassigns her based upon her allegedly poor performance during that period, the employee may well have been harmed by the employer's FMLA violation." But this holding does not support JVM's contention that it was obligated to prohibit Cypher from working from home during his FMLA leave.[20]

Cypher's contention that he requested the accommodation of remote work by leaving the LTD form blank and asking JVM to complete it is unpersuasive. At the same time, however, JVM has not addressed the question of whether Cypher—who was permitted to engage in remote work prior to his FMLA leave—would have been permitted to engage in remote work after his leave expired.

---

[19] Cypher also argues that Defendants did not comply with federal regulations by notifying him when he took FMLA leave that a return-to-work certification would be required and that they could have waived this requirement. While Defendants dispute these arguments, the Court need not resolve this issue because Cypher was not terminated for failing to submit the certification.

[20] Moreover, Defendants' position is not supported by other relevant case law. *See Massey–Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1159-60 (8th Cir. 2016) (noting that FMLA regulations "permit voluntary and uncoerced acceptance of work by employees on medical leave, so long as acceptance is not a condition of employment"). *See also* 29 C.F.R. § 825.220(d)(1) (the FMLA does not "prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a light duty assignment while recovering from a serious health condition.")

As discussed above, although the LTD application was not a request for accommodation in the form of remote work, part-time work or light duty, it was provided by JVM to "bridge the timing" of Cypher's return after the expiration of his FMLA leave. As defendants knew, Cypher's return to work was going to be delayed until October 18 and then until October 27, and explicitly or implicitly approved of these extensions, only to terminate his employment two days before he could obtain the certification to return.[21]

Finally, Defendants note RV's belief that Cypher was misusing his leave based on their review of the video of Cypher's activities on October 22. At the same time, Defendants have cited nothing to support the claim that RV's belief was reasonable. *See Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 340 (E.D.N.Y. 2010) (honest belief defense did not warrant granting summary judgment where plaintiff was caught on surveillance video engaging in tasks which the defendant believed were inconsistent with his FMLA leave because "the video covers a small part of [plaintiff's] leave" and unresolved factual disputes existed as to whether the observed conduct was inconsistent with plaintiff's doctor's prescriptions).

As the Court of Appeals has held, because a FMLA retaliation claim turns on the employer's intent, "where an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge." *Capps*, 847

---

[21] In their reply brief, Defendants argue that they "never promised [Cypher] he would have leave until his next appointment[;] he told Defendants when his next appointment was and assumed they would allow him to continue to be off work." (ECF No. 125 at 12.) At the same time, it is undisputed that they did not tell him that he had to return on October 19. Rather, Poole simply replied that he should bring in a return-to-work certification when he resumed his job. Defendants did not terminate his employment until the 25th.

F.3d at 152.[22] In *Capps,* an employee who had requested and received intermittent leave was terminated after the employer discovered that some of his days off coincided with his arrest and conviction on DUI charges. The court concluded that:

> Although Capps argues that Mondelez was mistaken in its belief that Capps misused his leave or was otherwise dishonest with regard to the leave taken, there is a lack of evidence indicating that Mondelez did not honestly hold that belief. Accordingly, in light of insufficient evidence for a reasonable factfinder to conclude that Mondelez's legitimate, nondiscriminatory explanation for terminating Capps' employment was a pretext, the District Court properly granted summary judgment on Capps' FMLA retaliation claim.

*Id.* at 155.

Here, however, Cypher has proffered some evidence from which a finder of fact might reject Defendants' claim that RV honestly believed that Cypher was misusing his leave. Defendants contend that, upon seeing the video of Cypher, RV told MV that Cypher should be terminated because he was "cheating the system" and the contemporaneous nature of this comment demonstrates that it was his honestly held belief. As noted above, however, Defendants cite no support for RV's belief that Cypher's actions were inconsistent with his medical restrictions or that he was cheating the system. Nor did RV consult with Dr. Szabo, actively pursue efforts to obtain further medical information, or raise the issue with Cypher.

Cypher also points to evidence that immediately after the termination, RV said that Cypher "knew it was coming and that he screwed up and didn't care. He could have called and tried to talk about it." (Pl.'s App. Ex. AP). But RV had not spoken to Cypher since August 26, 2022, and

---

[22] As this quote makes clear, the "honest belief defense" is merely an application of the usual rule that the employer must articulate a legitimate, non-discriminatory reason for its adverse employment action and the employee must proffer evidence that this reason is a pretext for unlawful discrimination. No authority within the Third Circuit supports the view that an employer may obtain summary judgment in its favor simply by stating that it honestly believed the employee was misusing his FMLA leave.

Cypher had contacted Poole and sent, albeit belatedly, a doctor's note the day before he was terminated (Cypher Dep. 116:9-21; R. Vecchi Dep. 288:2-9; Pl.'s App. Ex. BB). Poole relayed the substance of this call to the Vecchis, noting that Cypher was planning to obtain documents from his doctor, but they did not communicate with him further. Moreover, when MV told RV that she would inform Cypher's department of his termination, RV responded, "Ha, ha. Just tell them why we let him go basically cheating the system." (Pl.'s App. Ex. AP.) When she replied, "I mean I am not supposed to say that," he wrote, "I just feel like we should let people in on why we get so irritated at points about feeling taken advantage of." (*Id.*)

Defendants contend that RV's comments were solely directed at Cypher's actions and did not reflect an animus at employees taking FMLA leave in general. But that conclusion relies on an inference drawn in Defendants' favor which is inappropriate in resolving a motion for summary judgment.

The Court also notes that in the decisions on which Defendants rely, the employer had an independent basis for terminating the employee and only took this action after investigating the matter and allowing the employee to present his side of the story. *See Capps*, 847 F.3d at 152 (employee violated company's Dishonest Acts Policy by reporting that his medical condition was flaring up on days that he was in court on his DUI charge); *Warwas*, 489 F. App'x at 588 (employee violated City's municipal code by working for another city); *Parker*, 309 F. App'x at 563 ("Verizon has demonstrated that Parker was not terminated for his use, but rather his misuse, of medical leave in violation of its Code of Business Conduct" after an investigation revealed that he was working on the construction of his house while he was on medical leave); *Callison*, 430 F.3d at 120-21 (employee, who was already on a Sick Abuse List, was terminated after an investigation showed that he was violating the terms of a company's sick leave policy, which did not conflict

with the FMLA); *Conoshenti*, 364 F.3d at 148 (employee was terminated for violating a "last-chance agreement" and was not protected by the FMLA after his leave expired).

This is not to suggest that the FMLA requires such procedures, but only to note that, when an employer does not investigate the matter or discuss it with the employee, it is relying solely on a statement by the employer that the employee challenges with some evidence, thus creating a classic "he said, she said" situation that must be resolved by the jury.

JVM has not referenced any other company policy that Cypher violated and it did not investigate whether his actions were inconsistent with his previously claimed medical restrictions. Nor did it discuss the matter with Cypher or his doctor. Instead, it told him that it needed no further information, did not follow through with obtaining any further medical information from his doctor and proceeded to terminate his employment. Under these circumstances, whether Defendants had an "honest belief" that Cypher was misusing his leave and misrepresenting his limitations is a material disputed fact. The trier of fact will have to evaluate this evidence. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998) ("When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held.").

Therefore, with respect to the retaliation claim against JVM in Count IV, the motion for summary judgment will be denied.

C. Individual Liability of the Vecchis

In addition to the arguments made by JVM, the Vecchis move for summary judgment with respect to the FMLA claims against them on the ground that Cypher has not proffered evidence

from which the trier of fact could conclude that they should be held liable.

The FMLA provides that the term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). *See also* 29 C.F.R. § 825.104(a) ("Employers covered by FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer."); 29 C.F.R. § 825.104(d) ("individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA.")

The Court of Appeals has held that:

> Section 2611(4)(A)(ii)(I)'s inclusion of "any person who acts, directly or indirectly, in the interest of an employer" plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's "employer." Indeed, otherwise, § 2611(4)(A)(ii)(I) adds nothing to § 2611(4)(A)(i)'s definition of an employer as "any person . . . who employs 50 or more employees."

*Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 413 (3d Cir. 2012).

The court in *Haybarger* noted that: "In analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, most courts look to the 'economic reality' of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee." 667 F.3d at 417 (footnote and citations omitted). The court cited with approval a case from the Second Circuit that held that "some of the relevant factors in ascertaining the economic reality of the employment situation include whether the individual '(1) had the power to hire and fire the employee[ ], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Id.* (quoting *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). The *Herman* case also stated that: "No one of the four factors standing alone

31

is dispositive. Instead, the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive. Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.*

It is undisputed that RV was the president of the company and took full responsibility for making the decision to terminate Cypher's employment. Thus, he may be held liable under the FMLA. With respect to MV, however, it is uncontroverted that she was not Cypher's supervisor, did not make the decision to terminate his employment and in fact, questioned RV's decision. (M. Vecchi Dep. 67:21-68:7.) Therefore, there is no basis to hold MV liable under the FMLA.

For that reason, the motion for summary judgment will be granted in favor of MV with respect to Count IV and denied with respect to RV.

**V.    Conclusion**

For the reasons explained above, Defendants' motion for summary judgment will be granted with respect to Count III, the FMLA interference claim in Count IV and the claim against Melissa Vecchi in Count IV and denied in all other respects.

An appropriate order will follow.

Dated: December 19, 2025                    BY THE COURT:

                                            /s/ Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            UNITED STATES MAGISTRATE JUDGE